UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
DIVISION 1181 AMALGAMATED TRANSIT
UNION – NEW YORK EMPLOYEES PENSION
FUND, by its trustees,

                        Plaintiff,                              13-cv-9112 (PKC)

            -against-                                           MEMORANDUM
                                                                <u>AND ORDER</u>


NEW YORK CITY DEPARTMENT OF
EDUCATION,

                        Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

            This action is brought by plaintiffs Division 1181 Amalgamated Transit Union -

New York Employees Pension Fund and its board of trustees (collectively, the "Fund").  The

Fund is a multiemployer pension plan that provides retirement benefits to New York City school

bus drivers and other employees who work in student transportation.  The Fund's participants

include employees of eleven non-party bus companies that contracted with the New York City

Department of Education (the "DOE").  In or around 2013, their contracts with the DOE expired

and were not renewed.  The bus companies each withdrew from the Fund around that time.

            In this action, the Fund seeks to hold the DOE liable for failing to pay employee

contributions.  In a prior ruling, this Court partially granted the DOE's motion to dismiss

pursuant to Rule 12(b)(6), Fed. R. Civ. P., and dismissed claims alleging that the DOE had direct

contractual obligations to the Fund, or that it functioned as a single or joint employer with the

eleven non-party bus companies.  <u>Div. 1181 Amalgamated Transit Union - New York</u>

Employees Pension Fund v. New York City Dep't of Educ., 2014 WL 4370724, at *8 (S.D.N.Y. Aug. 27, 2014), reconsideration granted in part, 2014 WL 6647368 (S.D.N.Y. Nov. 24, 2014).

The remaining claims assert that the eleven non-party bus companies are the DOE's corporate alter egos. According to the Fund, the DOE violated the Employee Retirement Income Security Act, 29 U.S.C. § 1001, et seq. ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act, 29 U.S.C. § 1381 (the "MPPAA"), by failing to make required contributions to the Fund. In the aggregate, the Fund alleges that the DOE owes more than $100 million in payment for its alleged withdrawal liability.

Discovery in this case is now closed, and the DOE moves for summary judgment in its favor. For the reasons that will be explained, no reasonable trier of fact could conclude that the eleven non-party bus companies identified by the Fund are alter egos of the DOE. The DOE's motion for summary judgment is therefore granted.

BACKGROUND.

Many of the facts set forth by the DOE are undisputed. To the extent that the Fund disputes a fact, the Court accepts the Funds' version. In all instances, the Court draws every reasonable inference in favor of the Fund as the non-movant. Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (quotation marks omitted).

The DOE is a government entity that provides education to approximately 1.1 million students in New York City (the "City") through the operation of approximately 1,600 public schools. (Def. 56.1 ¶ 2; Pl. 56.1 Resp. ¶ 2.) Under state law, the DOE is required to award all busing contracts through competitive, sealed bidding. (Def. 56.1 ¶ 38; Pl. 56.1 Resp. ¶ 38.)

The DOE's history with bus contractors is important to an understanding of the Fund's claims. In 1979, following a strike by bus company employees, the DOE reached a negotiated agreement with certain local transit unions. (Def. 56.1 ¶¶ 39-40; Pl. 56.1 Resp. ¶¶ 39-40.) This agreement, known as the "Mollen Agreement," provided for certain employee protections that became standard in DOE busing contracts. (Def. 56.1 ¶¶ 41-51; Pl. 56.1 Resp. ¶¶ 41-51.)

The employee protections of the Mollen Agreement remained in place until 2012, following litigation in which some bus companies successfully challenged certain employee protections as unlawful. (Def. 56.1 ¶ 54; Pl. 56.1 Resp. ¶ 54.) In 2012 and 2013, the DOE solicited bids for new bus contracts that would replace those set to expire in 2013. (Def. 56.1 ¶¶ 54-56; Pl. 56.1 Resp. ¶¶ 54-56.) Numerous companies submitted sealed bids. (Def. 56.1 ¶ 56; Pl. 56.1 Resp. ¶ 56.) When the DOE awarded new contracts, they did not contain the employee protections that were standard under the Mollen Agreement. (Def. 56.1 ¶ 56; Pl. 56.1 Resp. ¶ 56.)

Amid these changes to the contracting landscape, the DOE did not renew its contracts with certain bus companies that had long provided student transportation. (Third Am. Compl't ¶ 91.) The Fund now contends that the DOE has withdrawal liability for eleven of those companies, which it characterizes as alter egos of the DOE.

Each of those eleven companies entered into a collective bargaining agreement ("CBA") with Amalgamated Transit Union Local 1181-106, AFL CIO ("Local 1181"). (Def. 56.1 ¶ 90; Pl. 56.1 Resp. ¶ 90.) The DOE is not a signatory to the CBA, and was not directly involved in its negotiation. (Def. 56.1 ¶ 91; Pl. 56.1 Resp. ¶ 91.) Each CBA defines "Employer" as the respective bus company that executed the CBA. (Def. 56.1 ¶ 92; Pl. 56.1 Resp. ¶ 92.) The

CBA set forth the terms of certain employee protections and benefits, and the required employer contributions to fund those benefits. (Def. 56.1 ¶¶ 93, 95; Pl. 56.1 Resp. ¶¶ 93, 95.) The CBA permits Local 1181 to conduct routine audits of the bus companies to review their contributions to the employee pension fund; while the union was permitted to conduct such audits, nothing in the CBA permits the DOE to conduct audits. (Def. 56.1 ¶ 102; Pl. 56.1 Resp. ¶ 102.) As noted, the Fund contends that the bus companies were the DOE's alter ego for ERISA purposes. It contends that, as an alter ego, the DOE has withdrawal liability to the Fund, to the same extent as if it had been a signatory to the CBA with Local 1181.

The DOE's summary judgment motion asserts that no reasonable trier of fact could conclude that the eleven bus companies were its alter egos. In support of its motion, the DOE has submitted evidence about each of the eleven companies, including facts about their history, ownership, management, corporate form, business operations, revenue sources and the consequences of the DOE's failure to renew its contract with each company. (Def. 56.1 ¶¶ 104-545; Pl. 56.1 ¶¶ 104-545.) The eleven bus companies alleged to be alter egos of the DOE include three entities wholly owned by Atlantic Express Transportation Corp. (the "Atlantic Entities"), Hoyt Transportation Corp. and a related company, DAK Transportation Corp. ("Hoyt"), Logan Transportation Systems, Inc. ("Logan"), Canal Escorts, Inc. ("Canal"), B&M Escorts Inc. ("B&M"), R and C Transit, Inc. ("R and C"), and Tufaro Transit Co., Inc. and a related company, School Days Inc. ("Tufaro"). (See id.)

The Fund commenced this action on December 26, 2013, and alleged that the DOE was liable to the Fund as a result of the bus companies' withdrawal. (Docket # 1.) The DOE moved to dismiss the Complaint for failure to state a claim pursuant to Rule 12(b)(6). This Court granted the motion in part, but concluded that the Complaint plausibly alleged that, for

ERISA purposes, the non-party bus companies functioned as corporate alter-egos of the DOE. Division 1181 Amalgamated Transit Union - New York Employees Pension Fund v. New York City Dep't of Ed., 2014 WL 4370724 (S.D.N.Y. Aug. 27, 2014), reconsideration granted in part, 2014 WL 6647368 (S.D.N.Y. Nov. 21, 2014).  The parties have engaged in extensive pretrial discovery and discovery is now closed.  The parties agree that any trial of this action would be to the Court without a jury.  (Docket # 63.)

SUMMARY JUDGMENT STANDARD.

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  A fact is material if it "might affect the outcome of the suit under the governing law . . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant."  Delaney, 766 F.3d at 167 (quotation marks omitted).  It is the initial burden of the movant to come forward with evidence on each material element of his claim or defense, demonstrating that he is entitled to relief, and the evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law.  Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008).  "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248).

Determination of alter-ego status is generally a question of fact. See, e.g., Moore v. Navillus Tile, Inc., 2016 WL 750797, at *8 (S.D.N.Y. Feb. 24, 2016) (McMahon, J.). Thus, summary judgment is inappropriate when the evidence would permit a reasonable trier of fact to conclude that one organization is the alter ego of another. See id.

DISCUSSION.

A.  The Law of ERISA Alter Egos.

"The purpose of the alter ego doctrine in the ERISA context is to prevent an employer from evading its obligations under the labor laws 'through a sham transaction or technical change in operations.'" Ret. Plan of UNITE HERE Nat'l Ret. Fund v. Kombassan Holding A.S., 629 F.3d 282, 288 (2d Cir. 2010) (quoting Newspaper Guild of N.Y., Local No. 3 of the Newspaper Guild, AFL-CIO v. NLRB, 261 F.3d 291, 298 (2d Cir. 2001)); accord Lihli Fashions Corp. v. N.L.R.B., 80 F.3d 743, 748 (2d Cir. 1996), as amended (May 9, 1996).  Alter-ego status binds a non-signatory to the terms of a CBA.  United Union of Roofers, Waterproofers, & Allied Workers Local No. 210, AFL-CIO v. A.W. Farrell & Son, Inc., 547 F. App'x 17, 22 (2d Cir. 2013) (summary order).  If an entity is an alter ego for ERISA purposes, Courts will pierce the corporate veil in order to protect employee benefits.  UNITE, 629 F.3d at 288.

Alter-ego status is determined by a "flexible" test that weighs the circumstances of each case, and considers the "important" factors of "'whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership.'"  Id. (quoting Goodman Piping Prods., Inc. v. NLRB, 741 F.2d 10,

11 (2d Cir. 1984)).  Evidence of anti-union animus is "germane" to the analysis, but not dispositive.  Id.

The inquiry "depends on 'the totality of the facts.'"  Trustees of the New City Dist. Council of Carpenters Pension Fund v. Integrated Structures Corp., 595 Fed. App'x 15, 17 (2d Cir. 2014) (summary order) (quoting United States v. Funds Held in the Name or for the Benefit of Wetterer, 210 F.3d 96, 106 (2d Cir. 2000)).  UNITE affirmed the district court's finding of alter-ego status when the chairman of a parent company exercised total control over four assignee companies and was the sole shareholder of each.  629 F.3d at 289; see also Gesualdi v. Juda Const., Ltd., 2011 WL 5075438, at *8-9 (S.D.N.Y. Oct. 25, 2011) (concluding at summary judgment that companies were alter egos for ERISA purposes based on their common ownership, management, business purpose, operations, equipment, employees and customers) (Berman, J.).  But even "substantial overlap in management and operations," without more, is inadequate to establish alter-ego status.  Council of Carpenters, 595 Fed. App'x at 17-18.  When companies have different business purposes, different telephone numbers, file separate tax returns, maintain separate bank accounts and finances, and do not share the same equipment, such facts weigh against alter-ego status, and must be considered by a trier of fact. Id. at 18.

As noted, the DOE has come forward with detailed evidence concerning each of the eleven non-party bus companies.  In opposition, the Fund has come forward with facts that, it contends, permit a reasonable trier of fact to conclude that the companies functioned as an alter ego of the DOE.  In reviewing the factors used to decide alter-ego status, the Court ultimately weighs the totality of the facts, applying a flexible test that considers the unique context of this case. But, on a summary judgment motion, the Court may not engage in fact-finding or

credibility assessment.  Instead it must determine, based upon the totality of facts and drawing every reasonable inference in the non-movant's favor, whether a reasonable fact finder could find in the Funds' favor.

### B. The Fund Has Not Come Forward with Evidence of Common Ownership.

The Fund has not come forward with evidence that the DOE and its eleven purported alter egos have substantially identical ownership.  See UNITE, 629 F.3d at 288.  As noted, the DOE is a school district and a government entity.  (Def. 56.1 ¶¶ 1-2; Pl. 56.1 Resp. ¶¶ 1-2.)  Both the City and the State of New York have authority over the DOE.  (Def. 56.1 ¶¶ 7-13; Pl. 56.1 Resp. ¶¶ 7-13.)

The DOE has come forward with undisputed evidence that the eleven bus companies are private firms.  The three Atlantic Entities were respectively founded in 1979, 1998 and 2005.  (Def. 56.1 ¶¶ 115, 117, 119; Pl. 56.1 Resp. ¶¶ 115, 117, 119.)  Their parent company began as a family-owned business, which was sold to a private equity fund in 1998, and, in turn, sold to an investment firm in 2009.  (Def. 56.1 ¶¶ 104-11; Pl. 56.1 Resp. ¶¶ 104-11.)  Hoyt, Logan and Canal are family-owned businesses.  (Def. 56.1 ¶ 200, 329, 381; Pl. 56.1 Resp. ¶ 200, 329, 381.)  B&M began as a partnership, but in 2000 all partnership interests were acquired by the company's current owner and president.  (Def. 56.1 ¶¶ 428-33; Pl. 56.1 Resp. ¶¶ 428-33.)  R and C is a corporation owned by two shareholders.  (Def. 56.1 ¶ 473; Pl. 56.1 Resp. ¶ 473.)  Tufaro began as a partnership, until all partnership interests were transferred to a sole shareholder, with ownership then transferred through a succession of sole shareholders.  (Def. 56.1 ¶¶ 501-05; Pl. 56.1 Resp. ¶¶ 501-05.)

In opposition, the Fund has not offered evidence that the DOE has an ownership interest in any of the eleven non-party bus companies.  It acknowledges that the DOE did not

"technically" own the bus companies. (Opp. Mem. at 18.) The Fund instead notes that the DOE sometimes provided non-recourse loans to the bus companies, and also arranged for insurance and fuel discounts. (Pl. 56.1 Resp. ¶ 112; Pl. 56.1 ¶¶ 35-56.) The Fund describes how contractors' vehicles were insured by the DOE, cites deposition testimony from a DOE witness who described the insurance as "a largely subsidized insurance program for the school age, school bus fleet," and the testimony of other witnesses who said that the DOE's subsidized insurance was necessary in order to make bus contracts economically viable. (Pl. 56.1 ¶¶ 35-52.) Other witnesses testified that the bus companies relied on DOE payments in order to meet their obligations to pay into employee benefit funds. (Pl. 56.1 ¶¶ 57-60.)

Evidence of subsidies or coordination by the DOE is not evidence of common ownership. The eleven bus companies independently elected to do business with the DOE. To the extent that the DOE arranged for the insurance used by the bus companies, or made payments to the companies, a reasonable trier of fact would not conclude that such actions are evidence that the DOE owns the private bus companies.

This factor weighs against classifying the eleven non-party bus companies as an alter ego of the DOE.

### C. The Fund Has Not Come Forward with Evidence of Common Management.

The Fund has not come forward with evidence that would permit a reasonable trier of fact to conclude the DOE and the eleven bus companies have substantially identical management. See UNITE, 629 F.3d at 288.

The DOE has come forward evidence that the eleven bus companies each had management that was independent of the DOE. The Fund does not dispute that the Atlantic Entities independently developed business strategies, managed their own budgeting and

accounting, made hiring and salary decisions, and devised plans to provide safe and timely service, all independent of the DOE. (Def. 56.1 ¶¶ 137-64; Pl. 56.1 Resp. ¶¶ 137-64.) The other bus companies also had separate management that independently made business and personnel decisions. (Def. 56.1 ¶¶ 263-80, 349-58, 409-23, 455-66, 486-96, 532-40; Pl. 56.1 Resp. ¶¶ 263-80, 349-58, 409-23, 455-66, 486-96, 532-40.) The bus companies retained accounting firms and legal counsel of their choosing. (See, e.g., Def. 56.1 ¶¶ 272-75, 351, 412-15, 457; Pl. 56.1 Resp. ¶¶ 272-75, 351, 412-15, 457.)

In opposition, the Fund has not set forth evidence to show overlapping management between the DOE and the eleven non-party bus companies. Rather, it points to evidence that the bus companies tailored their businesses to the standards and needs of the DOE. The Fund notes that the DOE set standards for drivers and other employees who supervised students, and assigned the companies to specific routes and bus stops. The DOE's requirements specifically included the hiring of aides with the job title of "escort," who assisted in the transport of handicapped students and were required by City law. (Opp. Mem. at 4; Def. 56.1 ¶¶ 67-68; Pl. 56.1 Resp. ¶¶ 67-68.) The Fund also cites to testimony from managers of the bus companies who testified that they felt obligated to satisfy DOE demands, requests and assignments. (Pl. 56.1 ¶¶ 174-82.) A rational economic actor supplying goods or services to a major customer can be expected to cater to the wants, needs and desires of that customer. Evidence of efforts to meet a customer's standards and preferences is not evidence of common management. No reasonable trier of fact could conclude that this is evidence of common or overlapping management.

This factor weighs against classifying the eleven non-party bus companies as alter egos of the DOE.

D. <u>The Fund Has Not Come Forward with Evidence that the DOE and the Bus Companies Shared Common Operations or Equipment.</u>

The Fund has not come forward with evidence that the DOE and the eleven bus companies share common operations or equipment.  See <u>UNITE</u>, 629 F.3d at 288.

The bus companies operate out of separate, independent locations throughout the City, and, in some instances, throughout the United States.  (Def. 56.1 ¶¶ 126-28, 228-32, 338-48, 394-408, 446-54, 483-85, 526-28; Pl. 56.1 Resp. ¶¶ 126-28, 228-32, 338-48, 394-408, 446-54, 483-85, 526-28.)  The bus companies all own or lease the vehicles that they used to transport students.  (Def. 56.1 ¶¶ 173, 178, 314-18, 425, 497-98; Pl. 56.1 Resp. ¶¶ 173, 178, 314-18, 425, 497-98.)  There is no evidence that the DOE had an ownership interest in the equipment used by the bus companies.

In opposition, the Fund states that the DOE required the companies to use proprietary computer programs that set bus routes and logged complaints.  (Pl. 56.1 ¶¶ 98-103.)  It notes that the DOE gave bus companies $3,000-$4,000 payments to update air conditioning systems and obtained third-party grants for the installment of reduced-emissions diesel filters.  (Pl. 56.1 ¶¶ 109-12.)  The DOE also set certain restrictions on the use of school buses for non-DOE work.  (Pl. 56.1 ¶¶ 124-29.)

A reasonable trier of fact could not conclude that this is evidence of common operations or equipment.  Given the DOE's dependence upon these vendors to transport students to schools, payments to update air-conditioning systems (which benefit the DOE's student population) or to reduce diesel emissions (which benefits the City, its citizens and its students) is rational conduct independent of any common operations or equipment.  The Fund does not

contend that, for example, that the DOE obtained a secured interest in the air conditioners or diesel filters that it helped the companies to obtain, or explain why certain restrictions on the after-hours use of school buses gave the DOE ownership interest in the vehicles. Moreover, the use of a computer program to communicate bus routes is evidence that the DOE worked to coordinate a complex transportation system involving numerous bus contractors – not that the contractors were corporate alter egos established to avoid ERISA obligations.

This factor weighs against classifying the eleven non-party bus companies as alter egos of the DOE.

### E. The Fund Has Not Come Forward with Evidence that the DOE and the Bus Companies Shared a "Business Purpose" that Is "Substantially Identical."

"In the ordinary case, two entities have the same 'business purpose' if they deal in the same product or service." Newspaper Guild of New York, Local No. 3 of Newspaper Guild, AFL-CIO v. N.L.R.B., 261 F.3d 291, 299 (2d Cir. 2001). But operations in the same industry does not establish a shared business purpose. See Lihli Fashions, 80 F.3d at 749 (fashion manufacturer and fashion marketer did not share a common business purpose). Moreover, where one company exists to make a profit and another is "legally barred from earning any profits at all," that distinction alone may be sufficient grounds to conclude that they do not share a business purpose. Newspaper Guild, 261 F.3d at 300-01.

As the Fund points out, the DOE and the eleven bus companies shared a common goal to provide for the safe and timely transportation of New York City students. (Opp. Mem. at 11; Pl. 56.1 ¶¶ 132-37.) But the DOE's purpose is to educate schoolchildren in its capacity as a not-for-profit governmental agency. In contrast, the bus contractors were private firms in business for the purpose of earning a profit from transporting students. It is no more of a shared common business purpose than that of vendor and vendee of any long-term supply contract. The

purchaser hopes that during the life of the contract, the goods or services will be delivered in conformity with the contract and in accord with its needs, and the seller hopes to be paid by a happy purchaser in a timely fashion.  A reasonable trier of fact could not conclude that the bus companies and the DOE had shared a common "business purpose."  See UNITE, 629 F.3d at 288.

This factor weighs against classifying the eleven non-party bus companies as alter egos of the DOE.

F. The Fund Has Not Come Forward with Evidence that the DOE and the Bus Companies Shared Common Customers.

According to the Fund, students were the customers of both the DOE and the eleven non-party bus companies.  The Fund argues that this factor weighs in favor of alter-ego status.

But the Fund has not come forward with evidence to defeat the DOE's showing that the DOE itself was the customer of the bus companies.  Given the commercial relationships between the DOE and the bus companies, no reasonable trier of fact could conclude that public school students were a common customer of the DOE and the bus companies.

In order to win business, the eleven non-party bus companies, along with other bus companies, engaged in competitive, sealed bidding with the DOE.  (See, e.g., Def. 56.1 ¶¶ 38, 54-56; Pl. 56.1 Resp. ¶¶ 38, 54-56.)  The DOE awarded contracts based on those bids.  (Def. 56.1 ¶ 56; Pl. 56.1 Resp. ¶ 56.)  As discussed, pursuant to these contracts, the DOE paid the bus companies and directed the services that they would provide.  The DOE was the client of the bus companies, as the word is typically understood.

By contrast, there is no evidence that the bus companies had commercial or business relationships with the students that they transported.  The Fund notes that the DOE

required bus companies to hire "customer service liaisons" who interacted with the DOE, schools and parents. (Pl. 56.1 ¶¶ 140-44.) But the colloquial term "customer service liaisons" does not make schoolchildren or their parents the customers of the bus companies. No student, parent of a student, or group of students or parents had the authority to direct the actions of the eleven bus companies. They did not have authority to hire or fire the bus companies, nor did they pay them for their services. That the transportation may have been for the students' ultimate benefit does not render them customers for the purposes of establishing an alter ego relationship under ERISA.

This factor weighs against classifying the eleven non-party bus companies as alter egos of the DOE.

G. The DOE Exercised Some Supervision over the Bus Companies.

The Fund has come forward with evidence that the DOE exercised supervision over the bus companies. Viewed in context, however, its supervision related to safety issues and staffing qualifications governed by extensive statutory and regulatory requirements. Given the nature of the DOE's supervision, a reasonable finder of fact would afford this evidence minimal weight toward the ultimate issue of alter ego status.

The Fund has come forward with evidence that the DOE regularly performed vehicle-safety inspections and set safety standards. (Pl. 56.1 ¶¶ 268-80.) DOE investigators sometimes had direct communications with the companies' drivers and gave them performance guidance. (Pl. 56.1 ¶ 291-304.) Throughout its submissions, the Fund discusses employees with the job title "escort," who were required by law to provide assistance to handicapped children while they were being transported. The Fund has come forward with some evidence that the

DOE gave instruction to drivers and escorts outside of the presence of company management. (Pl. 56.1 ¶¶ 301-04.)

The DOE's supervision arises in substantial part from safety requirements set by federal law, the New York State Education Law and the New York City Administrative Code. (See, e.g., Def. 56.1 ¶¶ 58-79; Pl. 56.1 Resp. ¶¶ 58-79.) Viewed in this context, the DOE's supervisory activities are not intrusions on the corporate formalities of the non-party bus companies, but part of an effort to ensure student safety and the DOE's compliance with legal obligations.

Moreover, the bus companies also implemented their own company-specific hiring standards and set guidelines for employee conduct. For example, Logan distributed its own employee handbook to each employee and conducted background screenings of applicants and Canal conducted its own driver training program. (Def. 56.1 ¶¶ 367-75, 416; Pl. 56.1 Resp. ¶¶ 367-75, 416.)

The Court therefore concludes that although the DOE sometimes acted in a supervisory capacity over the bus companies and their employees, a reasonable trier of fact would place minimal weight on this supervision as evidence of ERISA alter ego status.

### H. There Is No Evidence that the DOE Formed the Bus Companies to Evade Union Obligations.

Typically, the alter ego doctrine in the ERISA context applies to "situations involving successor companies" or "to situations where the companies are parallel companies." UNITE, 629 F.3d at 288. While the eleven non-party bus companies may have tailored aspects of their businesses around their contracts with the DOE, the Fund has come forward with no evidence that would tend to show that the bus companies are successors to any DOE entity or that they operate "parallel" to the DOE.

Animus toward unions is also non-dispositive evidence of alter ego status.  See id. According to the Fund, when the DOE first began to implement the Mollen Agreement in 1979, the standard employee protections used in busing contracts had the effect of insulating the DOE from labor obligations, including withdrawal liability.  (Opp. Mem. at 18-19.)  According to the Fund, the DOE strategically shifted withdrawal liability to outside bus companies and thus avoided subjecting itself to payment obligations.  (Id.)

The desire of a vendee of services, such as the DOE, to shift a liability from its own account to that of its vendors, the bus companies, is unremarkable in arm's-length commercial relationships.  It is perfectly consistent with the economic interests of the DOE, though adverse to the economic interests of the bus companies.  Characterizing the DOE's motivation as anti-union animus is based on speculation.  Moreover, under the Mollen Agreement, the DOE's contracts with bus companies incorporated employee protections as part of their standard terms.  Those protections stayed in place until 2012, when certain bus companies successfully challenged their use in court.  The Fund has not pointed to evidence of anti-union animus by the DOE.

I.  <u>Flexibly Reviewing the Alter Ego Factors in Full Context, No Reasonable Trier of Fact Could Conclude that the Eleven Non-Party Bus Companies Functioned as an Alter Ego of the DOE.</u>

The Court has reviewed the parties' evidence in light of the factors used to determine ERISA alter ego status, and comfortable concludes that no reasonable trier of fact could conclude that the non-party bus companies are an alter ego of the DOE.

The Fund has not come forward with evidence that the DOE and the bus companies have overlapping ownership and management.  The DOE, by contrast, has come forward with undisputed evidence that the bus companies were independently owned and

operated, and that their management did not overlap with the DOE. The DOE's role in procuring insurance for its contractors is not evidence of common ownership or management, nor is evidence that the bus companies worked to satisfy the performance demands and expectations set by the DOE. A reasonable business that contracts with a government entity would seek to perform adequately under its contract and tailor its work according.

To the extent that the DOE directly supervised the operations of the bus companies, that oversight involved vehicle safety and the qualifications of personnel responsible for student safety. Those issues are governed by federal, state and City laws. Even if they were not, it is reasonable that the DOE would take some steps to ensure that its students received safe transportation. The nature of this oversight and supervision is afforded minimal weight in favor of alter ego status. Without more, no reasonable trier of fact could conclude that it is evidence that the bus companies were the DOE's alter ego.

Further, the Fund has not come forward with evidence that the eleven non-party bus companies shared common facilities or equipment with the DOE. It is undisputed that the bus companies owned their own vehicles. Their facilities and equipment were owned independent of the DOE and of one another.

Lastly, the Fund has not come forward with evidence that the DOE's contracts with the bus companies were a result of anti-union animus, or that the companies were formed by the DOE to avoid ERISA obligations.

In light of the foregoing, the Court concludes that no reasonable finder of fact could conclude that the eleven non-party bus companies identified by the Fund are alter-egos of the DOE, such that the DOE was effectively a signatory to the CBA and therefore subject to withdrawal liability under ERISA and the MPPAA.

CONCLUSION.

The DOE's motion for summary judgment is GRANTED. (Docket # 105.) The Clerk is directed to terminate the motion, enter judgment for the defendant and close the case.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
        August 30, 2017